IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| KAYSVILLE CITY, a Municipal Corporation,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORP., In its Capacity as Receiver for Barnes Banking Company and in its corporate capacity,<br><br>Defendant. | **Memorandum Decision and Order**<br><br>Case No. 1:10-cv-00139-DB<br><br>Judge Dee Benson |

This matter is before the court on plaintiff's appeal of defendant's agency decision to refuse insurance coverage for escrow agreements made with a now failed banking institution which plaintiff styles "Brief of Kaysville City in Review, and Seeking the Setting Aside of the FDIC's Action in Refusing Insurance Coverage for Kaysville City" ("Kaysville Brief"). (Dkt. No. 72.) A hearing on this appeal was held on December 18, 2012. Plaintiff Kaysville City was represented by Gifford W. Price, Felshaw King and Robert C. Gross. Defendant Federal Deposit Insurance Corporation ("FDIC") was represented by Lina D. Soni and Thomas L. Holzman. Before the hearing, the court considered briefs and memoranda submitted by the parties. Since taking the motion under advisement, the court has further considered the law and facts relating to

1

the motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

## **Background**

This appeal arises from several agreements made by Kaysville with various developers to build or improve subdivisions in the city. Under the city ordinances, the developers were required to guarantee the installation, construction, and proper completion of subdivision projects. The developers allegedly opened escrow accounts with a state-chartered bank called Barnes Banking Company ("Barnes") to guarantee their work on the subdivisions. These alleged accounts were governed by agreements executed by Barnes. The agreements set forth conditions which, when met, would allow Kaysville to receive payment from Barnes drawn from the accounts. According to the agreements, Kaysville could receive money from the accounts to correct defects in particular subdivisions if, after two years, necessary improvements had not been properly installed, constructed or maintained by the subdivision's developers. However, before Kaysville could perfect a claim, the agreements required Kaysville to (1) notify the developer of the subdivision and Barnes of the defect in writing, (2) make demand on the developer to correct the defect, and (3) correct the defect using city resources and charge Barnes the cost to be paid from the account. Barnes would then pay Kaysville the cost of correcting the defect "on receiving reasonable proof...of the defect" and proof that "[Kaysville had] incurred the cost of correcting the defect." (*See* Szydzik Decl., Ex. A, Escrow Agreements.)

On January 15, 2010, the Utah Department of Financial Institutions closed Barnes. The FDIC was tasked with administrating the funds and assets of the failed institution. Whenever the

FDIC is appointed following a bank's failure, it must function in two separate capacities which are established by law. First, the FDIC functions as the receiver of a failed bank ("FDIC-Receiver"). In this capacity FDIC-Receiver assumes "all rights, titles, powers, and privileges of the insured depository institution." 12 U.S.C. § 1821(d). Second, the FDIC functions in its corporate capacity ("FDIC-Corporate") as the insurer of the deposits in the failed bank. 12 U.S.C. §§ 1811, 1818, 1821(f)(2012 Supp.). Claims brought against the FDIC in the wake of a bank's failure are subject to separate statutory and regulatory procedures associated with these two separate capacities of the FDIC depending on the nature of the claims. Following Barnes' failure, the FDIC began functioning in both of these capacities for the failed bank.

One month after the failure of Barnes, on February 10, 2010, Kaysville submitted six claims for deposit insurance, along with a number of receiver claims, to the FDIC. (*See* Szydzik Decl., Ex. A, Proofs of Claim.) Kaysville submitted six proofs of claim seeking a specified amount of money which Kaysville claimed was on deposit with Barnes to guarantee completion of six subdivisions. The proofs of claim were accompanied by copies of the original escrow agreements associated with each of the six subdivisions. (Id.)

On May 7, 2010, Kaysville sent a letter to the FDIC which included copies of several other letters which Kaysville styled "demand letters" to the various developers associated with the accounts for which Kaysville submitted claims. (Szydzik Decl., Ex. B., May 7 Letter.) The letter failed to explain the inclusion of the "demand letters," however they appear to have been included to demonstrate Kaysville's attempt to satisfy some of the terms identified in the escrow agreements. Each of the "demand letters" was sent to the developers after Barnes failed on January 15, 2010. Kaysville did not provide the FDIC with any evidence that it had made a

demand on any of the developers prior to the failure of Barnes.

Following the May 7 Letter, Kaysville engaged in additional discussions with the FDIC which culminated in a letter dated June 3, 2010 from Kaysville to the FDIC. (Szydzik Decl., Ex. C, June 3 Letter.) The June 3 Letter exclusively dealt with Kaysville's claim for deposit insurance, and did not address any of Kaysville's other claims directed to FDIC-Receiver. In the letter Kaysville explicitly asserts that "the escrow Agreements and the amounts therein are accounts covered by FDIC insurance." (Id.) The June 3 Letter also acknowledged and memorialized telephone conversations between Kaysville and the FDIC, including a specific telephone conversation in which the FDIC relayed its concern regarding Kaysville's insured deposit claims, pointing out that only two accounts "out of the ten original escrow Agreements . . . had actual money . . . and that the [other accounts] were merely lines of credit" and that the FDIC only "insured accounts where there was money in the account."(Id.)

FDIC Claims Agent John Szydzik was tasked with undertaking an investigation into Kaysville's claims. In accordance with FDIC policy, Claims Agent Szydzik was responsible for both the review and disposition of receivership claims arising from Barnes' failure and the separate task of reviewing Barnes' administrative claims for insured deposits. He worked with other FDIC personnel to perform a complete review of all of Kaysville's claims. (Szydzik Decl. at ¶¶ 2, 6, 9 and Ex. I, FDIC Internal Memoranda.)

Following the investigation into Kaysville's claims, Claims Agent John Szydzik issued a Notice of Disallowance on June 30, 2010, that denied all of Kaysville's claims, including its claims for insured deposits. (Szydzik Decl., Ex. H., Notice of Disallowance.) The Notice denied Kaysville's claims for five of the six subdivision accounts for three reasons: (1) the documents

submitted by Kaysville did "not meet the standards required under the Escrow Agreement cited in those materials"; (2) the escrow accounts underlying Kaysville's claims were "never funded" and "no actual cash funds were . . . at issue"; and (3) Kaysville had incurred no compensable damages giving rise to a breach of contract claim. The Notice denied the claim for the sixth subdivision, which had a funded savings accounts associated with it, because Kaysville didn't meet the standards required under the escrow agreement to receive funds and because the city had incurred no compensable damages. The Notice also disallowed Kaysville's other claims which were directed at FDIC-Receiver.

In early July there was an exchange of emails between Kaysville and the FDIC in which Kaysville asked whether the Notice of Disallowance was intended to disallow all of its claims, including those regarding deposit insurance. (*See* Resp. to Pl.'s Opening Brief by the FDIC, in its Corporate Capacity, Ex. A, Email Correspondence.) The FDIC responded by clearly stating that the Notice addressed all of Kaysville's claims, including the insurance deposit claims.

On August 19, 2010, Kaysville filed a complaint against the FDIC challenging the decisions communicated in the Notice of Disallowance. (Dkt. No. 1.) On May 31, 2011, FDIC-Corporate filed a Motion to Sever Count 3 of Kaysville's complaint from Counts 1 and 2 because counts 1 and 2 regarded the FDIC in its receiver capacity while Count 3 pertained only to an insured deposit determination by FDIC-Corporate which is a final agency decision subject to review under the Administrative Procedure Act ("APA"). (Dkt. No. 3.) The court granted this motion on September 27, 2011. (Dkt. No. 33.) This severance prompted Kaysville to file the present appeal for APA review of the FDIC's disallowance of its insured deposit claims as communicated in the June 30th Notice of Disallowance.

## Discussion

In its appeal, Kaysville asks the court to find that the FDIC's refusal of deposit insurance should be set aside as being inconsistent with applicable standards, fundamentally unfair, violative of law, and arbitrary and capricious. Kaysville also argues that the FDIC failed to properly express its refusal of claims for insured deposits with a final agency decision supported by a sufficient administrative record. In addition to setting aside FDIC's denial of Kaysville's insurance claims, Kaysville asks that the court mandate that the FDIC ascertain the amount of insurance proceeds to be paid to Kaysville.

## I. FDIC's Decision to Deny Kaysville's Claims for Deposit Insurance Was Not Arbitrary and Capricious

FDIC's decision denying Kaysville's deposit insurance claims was not arbitrary and capricious because Kaysville was not entitled to deposit insurance for any of the escrow agreements at the time Barnes failed. Deposit Insurance determinations are governed by specific regulations. 12 C.F.R. § 360.8(c); 12 C.F.R. § 330.3(i) *and* 12 C.F.R. § 330.5(a). According to these regulations, the FDIC must make three separate determinations when making a decision regarding deposit insurance. First, the FDIC must determine whether there was evidence of an insured deposit in the bank's ledger at the time the bank failed. 12 C.F.R. § 360.8(c). Second, if an insured deposit account exists, the FDIC then must determine the amount of the insured deposit at the time of the bank's failure. 12 C.F.R. § 360.8(c) *and* 12 C.F.R. § 330.3(i) Third, the FDIC must determine the owner of the account at the time the bank failed. 12 C.F.R. § 12 C.F.R. § 360.8(c) *and* 12 C.F.R. § 330.5(a).

All six of Kaysville's claims for deposit insurance fail under this regulatory rubric. First,

Barnes' books and records clearly show that on the day Barnes failed there were no insured deposit accounts related to five of the six subdivisions. Second, despite the fact that a personal savings account existed in association with the sixth subdivision, Kaysville was not the rightful beneficiary of the funds because Kaysville failed to satisfy the terms of the agreement for the sixth subdivision by the time Barnes failed.

### A. Kaysville Is Ineligible for Deposit Insurance for the First Five Subdivision Accounts

There were no deposit accounts on Barnes' ledger for five of the six subdivisions at the time of Barnes' Failure. According to the relevant statute, a "deposit" is "the unpaid balance of money or its equivalent received or held by a bank or savings association in the usual course of business and for which it has given or is obligated to give credit...." 12 U.S.C. § 1813(*l*). Despite statements in the escrow agreements executed by Barnes indicating the creation of funded accounts, no such deposits were found on Barnes' ledger for five of the six subdivisions on the date of Barnes' failure. (*See* Szydzik Decl., Ex. I, FDIC Internal Memoranda.) Rather than funded deposits, the FDIC found lines of credit for five of the six subdivisions. (Id.) A line of credit is, in substance, a potential loan, and a potential loan is not a deposit under the applicable statute. Notably, the potential loans in this case never occurred because the developers never drew against the lines of credit. (Id.) In other words, no funds were ever disbursed by the bank. Barnes never paid any loans to the developers. Furthermore, Barnes never "received or held" any proceeds from those loans for which Barnes "[gave] or was obligated to give credit." 12 U.S.C. § 1813(*l*). Therefore, as the Notice of Disallowance states, "the Escrow Agreement[s were] never funded" and "no actual cash funds were or are at issue" for five of the six accounts for which Kaysville seeks insurance. (Szydzik Decl., Ex. H, Notice of Disallowance.)

Kaysville mistakenly relies upon the First Circuit's holding in *FDIC v. Fedders Air Conditioning, USA, Inc.*, 35 F.3d 18 (1st Cir. 1994), to argue that an escrow agreement, given in exchange for a promissory note, is an insured deposit. However, the *Fedders* holding does not support this assertion. In *Fedders*, a party rendered a promissory note in exchange for a loan. *Fedders,* 35 F. 3d at 22. The bank subsequently made the loan and received proceeds from the loan but failed to set aside the proceeds in an escrow account as it had agreed to do. *Id.* The *Fedders* court determined that that the definition of "deposit" in 12 U.S.C. § 1813(*l*)(1) applied "not only [to] money or its equivalent for which the bank 'has given' credit to an account, but money or its equivalent for which the bank 'is obligated' to give credit to an account." *Id.* Because the bank in *Fedders* received actual proceeds from the loan it made, the court held that the bank was obligated to credit an escrow account with those proceeds and that such an obligation was covered by federal deposit insurance. *Id.*

*Fedders* is distinguished from the present case because no loans were actually made by Barnes. Though the developers executed promissory notes to establish lines of credit with Barnes, the lines of credit were simply agreements to make the loan. Since the creditors never drew against those lines of credit, Barnes never made any actual loans to the developers. Consequently, unlike the *Fedders* bank, Barnes never "held or received" any proceeds from the loans and was therefore never "obligated" to credit the escrow accounts with those proceeds. Thus, Barnes' unfunded promissory notes did not qualify as deposits under 12 U.S.C. § 1813(*l*) and the FDIC is not liable to Kaysville for deposit insurance.

Even if the escrow accounts for the first five subdivisions qualified as insurable deposits under the statute, Kaysville would still not be eligible for the deposit insurance because it was

not the appropriate beneficiary of the accounts under the terms of the agreements. As discussed above, when making an insured deposit determination, the FDIC must determine how insured accounts were owned at the time the bank failed. 12 C.F.R. § 360.8(c) *and* 12 C.F.R. § 330.5(a). The escrow agreements associated with the various subdivisions only entitled Kaysville to funds after Kaysville (1) notified Barnes and the developer of a defect in writing, (2) made a demand on the developer to correct the defect, and (3) corrected the defect and charged Barnes the cost incurred in making the correction. (Szydzik Decl., Ex. A, Escrow Agreements.) Furthermore, the agreements indicated that Barnes was only obligated to pay Kaysville after Barnes received "reasonable proof" of the defects and proof that Kaysville had incurred the costs of correcting them. *Id.* There is no indication that Kaysville took any of the steps necessary to perfect a claim under the agreements prior to the time the bank failed. Thus, in addition to being ineligible for deposit insurance because no insurable deposits existed for the first five subdivision accounts, Kaysville is ineligible for the insurance because it was not the rightful beneficiary of the accounts at the time Barnes failed.

### B. Kaysville's Ineligibility for Deposit Insurance for the Sixth Subdivision Account

Though the FDIC found a personal savings account associated with the escrow agreement for the sixth subdivision, Kaysville was not the proper beneficiary of the funds in the account and was therefore not entitled to deposit insurance for the account. The funds found in the personal savings account belonged to the developer of the sixth subdivision at the time Barnes failed because Kaysville had failed to satisfy the terms of the escrow agreement before January 15, 2010. There is no indication that Kaysville took any of the necessary steps to perfect its claim for the account prior to Barnes' failure. Kaysville's only demonstrated attempt to make

a demand on the developer was the demand letter sent after Barnes had already failed. Furthermore, Kaysville had not demonstrated that it incurred costs for making any improvements on the subdivision. Thus, the FDIC's decision to deny deposit insurance to Kaysville for the sixth subdivision was not arbitrary and capricious, but was rather based on how the account was owned at the time of the bank's failure. Kaysville "[did] not meet the standards required under the Escrow Agreement" and was therefore denied deposit insurance for the account. (Szydzik Decl., Ex. H, Notice of Disallowance.)

## II. FDIC's Notice of Disallowance Was a Proper Final Agency Decision Supported By an Appropriate Administrative Record

In its appeal, Kaysville argues that the FDIC did not make an insured deposit determination that could be considered a final agency action and that the FDIC has not provided an adequate administrative record.

### A. FDIC's Notice of Disallowance Constitutes a Final Agency Determination

In its appeal, Kaysville contends that the FDIC's decision to deny deposit insurance expressed in the Notice of Disallowance does not constitute a final agency decision. Kaysville maintains that the FDIC's Notice of Disallowance issued on June 30, 2012, had "nothing whatsoever to do with disallowing an insurance claim" and therefore cannot be a final agency determination regarding the insurance claims. (Kaysville Brief at 14.)

While it is true that the Notice of Disallowance addressed claims made against FDIC-Receiver, it also clearly addressed and denied Kaysville's insured deposit claims. It clearly appears that Kaysville understood, or should have understood, that the Notice addressed its insurance deposit claims because the FDIC had discussed the shortfalls of the insurance claims with Kaysville shortly before the Notice was issued. At least one particular telephone discussion

regarding Kaysville's insurance claims was memorialized by Kaysville in its June 3 Letter when Kaysville wrote that the FDIC "indicated that of the ten original escrow Agreements on Kaysville projects...only two had actual money in the accounts" and that the FDIC "insured only accounts where there was money in the account." (Szydzik Decl, Ex. C, June 3 Letter.) When Kaysville received the subsequent Notice of Disallowance dated June 30, 2010, stating that "no actual cash funds [were] at issue," Kaysville should have understood that this language pertained to its insurance deposit claims. (Szydzik Decl., Ex. H, Notice of Disallowance.) The reason given in the notice was virtually identical to that given by the FDIC to Kaysville in the telephone conversation which explicitly concerned the insurance claims. Finally, if Kaysville had any doubts as to whether the Notice of Disallowance was a determination regarding its insurance deposit claims, those doubts were eliminated during its July email correspondence with the FDIC in which the FDIC explained that the Notice of Disallowance denied all of Kaysville's claims, including the insurance deposit claims.

     Kaysville also maintains that the Notice of Disallowance cannot be a final agency determination regarding the deposit insurance claims because the author of the Notice, Claims Agent Szydzik, was a member of FDIC's receiver division, the Division of Resolution and Receiverships ("DRR"), when he drafted the notice. Kaysville argues that this fact contradicts the FDIC's position that the FDIC functions in two separate capacities and therefore renders the insured deposit determination arbitrary and capricious and an improper final agency decision. However, DRR has been delegated authority to allow and disallow claims for deposit insurance. DRR claims agents are trained to review all claims against FDIC-Receiver and FDIC-Corporate and to apply the appropriate legal analysis to each type of claim. Kaysville has not identified any

statute or regulation that forbids this efficient method of addressing claims. *See Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995)(stating that an agency's decisions must "be upheld so long as they do not collide directly with substantive statutory commands and so long as procedural corners [have been] squarely turned.") The administrative record in this case does not indicate that having a single claims agent from the DRR handle deposit insurance claims has resulted in a failure to squarely turn procedural corners. Furthermore, delegating both insurance and receivership claims to a single officer is long-standing FDIC practice. "[T]here is a presumption that public officers will act lawfully." *Goodwin v. Loone*, 250 F.2d 72, 74 (10th Cir. 1957); *see also Committee on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008). Kaysville has provided no evidence to rebut this presumption in the present case. Therefore, a claims agent employed by DRR can make and issue final determinations regarding insurance claims and such a practice is not arbitrary and capricious. The FDIC's denial of Kaysville's deposit insurance claims through a DRR employee qualifies as an appropriate final agency determination.

### B. FDIC Provided an Appropriate Administrative Record Supporting its Determination.

Kaysville also contends that the FDIC failed to provide an adequate administrative record to support its decision. Kaysville further argues that the FDIC improperly included an after-the-fact declaration of Claims Agent Szydzik in its administrative record. Kaysville fails to persuade the court with either argument.

Despite Kaysville's assertion to the contrary, the FDIC conducted a thorough analysis of Kaysville's insured deposit claims. The Tenth Circuit has held that "the duty of a court reviewing agency action . . . is to ascertain whether the agency examined all of the relevant

data." *Olenhouse v. Community Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). The FDIC filed an administrative record with the court that consists of a declaration of the reviewing claims agent accompanied by seventy-four pages of material supporting its insured deposit determination. (Szydzik Decl., Ex.'s A-I, Administrative Record.) The material within the administrative record includes documents representing Kaysville's claims, documents uncovered by the FDIC when investigating Barnes' books and records when the bank failed, internal memoranda drafted by FDIC personnel discussing the results of its investigation, communications between the FDIC and Kaysville, and the Notice of Disallowance. (Id.) This administrative record includes the very documents upon which FDIC based its insured deposit determinations, evidence of the analysis of these documents, and evidence of communications between Kaysville and the FDIC. Thus, the administrative record indicates that the agency adequately examined all of the relevant data.

Furthermore, the inclusion of a declaration of Claims Agent Szydzik to provide background information and necessary explanation of the administrative record is in accordance with the APA process. Kaysville relies on *Franklin Sav. Ass'n v. Office of Thrift Supervision*, 934 F.2d 1127 (10th Cir. 1991) to argue that the inclusion of the Szydzik Declaration demonstrates inappropriate reliance on material outside the record. However, while *Franklin* does state that "[APA] review shall be confined to the administrative record," the opinion also states that a reviewing court may go outside of the administrative record for limited purposes "where necessary for background information" or "where necessary to explain technical terms or complex subject matter involved in the action." 934 F.2d at 1137. Courts have routinely held that such limited supplemental information is appropriate for APA review. *See e.g. McDonnell*

*Douglas Corp. v. EEOC*, 922 F. Supp. 235, 238 n. 2 (E.D. Mo. 1996) (stating that an agency affidavit or declaration is permitted if it "helps explain the administrative record"). Claims Agent Szydzik's declaration falls into this category and is therefore appropriately included in the administrative record on review. Thus, the FDIC has provided an adequate administrative record for the purposes of APA review.

## Conclusion

For the foregoing reasons the court concludes that the FDIC properly denied Kaysville's deposit insurance claims. The FDIC's determination that no funded deposits existed to be insured for five of the six escrow agreements was not arbitrary and capricious, but was rather in accordance with FDIC regulatory policy. The FDIC's determination that Kaysville was not the qualified beneficiary of the sixth account–which was the only funded account– was not arbitrary and capricious because Kaysville clearly failed under the agreement to qualify for payment. Furthermore, the FDIC properly rendered a final agency decision through its DRR claims agent and provided an adequate and sufficient record to support that decision. Therefore, the FDIC's denial of Kaysville's insured deposit claims is upheld, and Kaysville's appeal is DENIED in its entirety.

Dated this 28th day of December, 2012.

BY THE COURT:

_____

                                            DEE BENSON

                                            United States District Judge